IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

JOHN LENTWORTH                    §
                                  §
            Plaintiff,            §
                                  §
VS.                               §        NO. 7-03-CV-156-BD
                                  §
DR. DAVID POTTER, ET AL.          §
                                  §
            Defendants.           §

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendants have filed a motion to dismiss and for summary judgment in this prisoner civil rights action brought under 42 U.S.C. § 1983.  For the reasons stated herein, the motion is granted.

I.

Plaintiff John Lentworth is a Texas prisoner who suffers from Type II diabetes, high blood pressure, and a variety of other health problems.  While incarcerated at the Allred Unit of the TDCJ-ID, plaintiff alleges that various doctors, nurses, and prison officials exhibited deliberate indifference to his medical needs, thereby subjecting him to a significant risk of serious harm.  In particular, plaintiff accuses one or more defendants of:  (1) failing to monitor his blood glucose levels with sufficient frequency; (2) ignoring his special dietary requirements; (3) failing to develop an adequate treatment plan for his condition; (4) providing inadequate medical care for a variety of symptoms related to his diabetes; (5) failing to administer medications prescribed by his doctors; and (6) systematically dismissing his complaints and requests for medical treatment.  Although plaintiff filed numerous grievances with the warden and other supervisory officials, no corrective action was taken.  Plaintiff also accuses one or more defendants of retaliating against him for filing grievances and for exercising his right of access to the courts.  By this suit, plaintiff seeks

unspecified money damages and equitable relief.

Defendants now move to dismiss this case or, alternatively, for summary judgment as to all claims and causes of action.[1]  The issues have been fully briefed by the parties and the motion is ripe for determination.

## II.

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A&M University System*, 117 F.3d 242, 247 (5th Cir. 1997), *quoting Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied*, 103 S.Ct. 729 (1983).  Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).  The complaint must be liberally construed in favor of the plaintiff and the allegations contained therein must be taken as true. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  If the moving party relies on matters outside the pleadings, a motion to dismiss must be treated as one for summary judgment and decided under the standard set forth in Fed. R. Civ. P. 56.  *See Lopez Hernandez v. Fincher*, No. 3-04-CV-1084-G, 2005 WL 265214 at *5 (N.D. Tex. Feb. 2, 2005), *citing* FED. R. CIV. P. 12(b).

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A summary judgment movant who does not have the burden of proof at trial must point to the absence of a genuine fact issue.

---

[1]  Defendants seek dismissal or summary judgment on the grounds that:  (1) there is no evidence that prison officials were deliberately indifferent to plaintiff's medical needs or retaliated against plaintiff for exercising his constitutional rights; (2) all defendants are entitled to either Eleventh Amendment immunity or qualified immunity; and (3) plaintiff has failed to exhaust his administrative remedies.  Because plaintiff's medical care and retaliation claims fail on the merits, the court addresses only the substantive aspects of those claims and, as necessary, the issue of exhaustion.

*Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir. 1995). The burden then shifts to the non-movant to show that summary judgment is not proper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 113 S.Ct. 82 (1992). All evidence must be viewed in the light most favorable to the party opposing the motion. *Rosado v. Deters*, 5 F.3d 119, 122 (5th Cir. 1993).

### III.

Plaintiff generally alleges that he was denied adequate medical care for his diabetes and related medical problems while incarcerated at the Allred Unit of the TDCJ-ID. Although his specific complaints are sometimes difficult to decipher,[2] plaintiff's claims can be grouped into three broad categories: (1) the initial delay in diagnosing his condition and the subsequent delay in providing medical care; (2) disagreements with medical decisions involving his course of treatment; and (3) the quality of medical care rendered by prison doctors and nurses.

### A.

The prohibition against cruel and unusual punishment embodied in the Eighth Amendment to the United States Constitution requires prison officials "to provide humane conditions of confinement, ensuring that inmates receive adequate food, clothing, shelter, and medical care." *Palmer v. Johnson*, 193 F.3d 346, 351-52 (5th Cir. 1999) (internal quotation marks and citations omitted). In order to establish a constitutional violation based on the denial of medical care, a plaintiff must show that officials acted with deliberate indifference such as to cause the "unnecessary or wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d

---

[2] In a 12-page affidavit included in his summary judgment appendix, plaintiff takes issue with virtually every decision made by the prison medical staff dating back to 2001. (Plf. MSJ App. at 193-204).

251 (1976). This, in turn, requires proof that the prison medical staff was subjectively aware of a substantial risk of serious harm and failed to take reasonable measures to abate that risk. *Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996), *citing Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994).

"Deliberate indifference is an extremely high standard to meet." *See Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Delay in providing medical care does not rise to the level of a constitutional violation unless the delay results in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Nor does an incorrect diagnosis or a disagreement with medical treatment constitute deliberate indifference. *See, e.g. Domino*, 239 F.3d at 756; *Norton v. Dimizana*, 122 F.3d 286, 292 (5th Cir. 1997). Rather, a plaintiff must show that the medical staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). To establish an Eighth Amendment claim, a plaintiff must plead and prove a deprivation of medical care sufficiently serious to show that "the state has abdicated a constitutionally-required responsibility to attend to his medical needs," *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983), and that prison officials knew of and disregarded "an excessive risk to inmate health or safety." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.), *cert. denied*, 120 S.Ct. 249 (1999), *quoting Farmer*, 114 S.Ct. at 1979.

### B.

The summary judgment evidence shows that plaintiff was diagnosed with Type II diabetes in late 2001 by the medical staff at the Allred Unit. (Plf. MSJ App. at 11, ¶ 6 & 193, ¶ 3). Periodic blood tests performed over the next three months revealed elevated glucose levels in the 300 to 400

mg/dl range.   (*Id.* at 24 & 194, ¶ 4).[3]  Despite these abnormal test results and other physical

symptoms associated with diabetes, including a weight loss of more than 50 pounds, plaintiff

received no treatment for this condition until March 2002.  (*Id.* at 193-94, ¶¶ 3-4).  Prison doctors

initially prescribed a variety of oral medications and continued to monitor plaintiff's blood sugars

on a regular basis.  (*Id.* at 194-96, ¶¶ 4-5).  Plaintiff also received nutritional counseling and was

placed on a special diabetic diet, which was not consistently followed by the prison staff.  (*Id.* at

200-01, ¶ 13).  From March 2002 until June 2005, plaintiff visited the prison infirmary no fewer than

70 times.  (*See id.* at 22-116).  Although plaintiff claims that he often was turned away by medical

staff for no reason, the record shows that he either was asked to leave the clinic or forcibly removed

by security guards on multiple occasions after becoming angry, belligerent, or engaging in

inappropriate behavior.  (Def. MSJ App. at 43, 49, 58, 90).  Other times plaintiff refused medical

treatment, such as finger-sticks needed to monitor his blood sugars.  (*Id.* at 64, 108-09).  In June

2004, plaintiff was started on a "sliding scale" of short-acting injectable insulin in addition to his

oral medications.  (Plf. MSJ App. at 12, ¶ 8).  Unfortunately, this new treatment regimen had little

effect on controlling plaintiff's consistently high blood glucose levels.  Doctors later prescribed small

doses of long-acting insulin to be administered in conjunction with short-acting insulin injections.

(*Id.* at 13, ¶ 8).  While this led to some improvement, plaintiff's blood glucose levels remained over

200 mg/dl, representing poor control.  (*Id.*).

      In addition to diabetes, plaintiff suffers from hypertension, chest pain, episodes of dizziness

and nausea, and tinea pedis or "athlete's foot."  (*Id.* at 11, ¶ 5 & 13-14, ¶¶ 9-10).  Many of these

conditions are commonly associated with diabetes or the side effects of insulin therapy.  (*Id.* at 13-

---

[3]  According to plaintiff's expert, a normal blood glucose level ranges between 60-110 mg/dl.  (Plf. MSJ App. at 11, ¶ 6).

14, ¶¶ 9-10).  According to plaintiff, prison doctors and nurses either ignored or trivialized these medical problems.  By way of example, plaintiff had elevated blood pressure readings in the 140/100 range as early as October 2001.  (*Id.* at 16, ¶ 14 & 22).  Yet his blood pressure was not monitored on a regular basis and he was not prescribed medication for this condition until May 2004--nearly three years later.  (*Id.* at 16, ¶ 14).  When plaintiff asked to see a cardiac specialist after experiencing chest pain, dizziness, and shortness of breath in late 2002 and early 2003, he was told that the medical staff does not schedule such examinations "just because you are a diabetic."  (*Id.* at 196, ¶ 7).  Plaintiff also complains that the medical staff failed to schedule diagnostic tests at regular intervals, did not provide him with regular foot care, neglected to administer medications prescribed by his doctors, and sometimes ran out of medications.  (*See id.* at 14, ¶¶ 10-11 & 195-202, ¶¶ 5, 8, 10, 16).

Plaintiff alleges that he suffered and continues to suffer "severe physical and psychological pain" as a result of the delays in receiving medical care and the substandard treatment rendered by prison doctors and nurses.  (*Id.* at 195-96, ¶¶ 5 & 203, ¶ 20).  Other than plaintiff's own self-serving testimony, the only evidence of substantial harm comes from Joseph Kenyon Asbury, M.D., a board-certified internal medicine specialist, who explains:

> [T]ype 2 diabetes, and its associated conditions, is a serious medical problem, and [ ] the failure to properly treat type 2 diabetes can result in serious complications and even death.
>
> * * * *
>
> Type 2 diabetes develops slowly as the body grows more and more resistant to the insulin it naturally produces, causing slow elevation of blood sugars.  The symptoms are subtle:  in the case of Mr. Lentworth, a prolonged case of tinea pedis, and weight loss.  (The weight loss was noted on the chart but not recognized by his treating physicians as a possible symptom of advancing diabetes).  However, elevated blood sugars may have been present, in fact probably were present, for years.  Damage has already been done to the body's

> tissues even before the person, or the medical community, is aware
> that there is a problem.  At the time of the diagnosis, many people
> will already have evidence of kidney disease, heart disease, and eye
> disease, especially people who also have high blood pressure.

(*Id.* at 11, ¶ 5 & 12, ¶ 7).  Dr. Asbury also criticizes the failure to properly treat plaintiff's

hypertension, which he states can lead to heart attack, kidney disease and stroke, as well as many

other aspects of plaintiff's medical care.  (*See id.* at 12-21, ¶¶ 8-21).  Based on his review of the

medical records and litigation materials provided by plaintiff and his attorney, Dr. Asbury concludes

that "Mr. Lentworth has certainly already suffered damage to his bodily tissues, and will be at

greater risk in the future for complications and even death, due to [the] failure to treat him promptly

and properly."  (*Id.* at 12, ¶ 6).

## C.

Viewed in the light most favorable to plaintiff, there is ample evidence to support a finding

that he received inadequate medical care for his diabetes, hypertension, and other physical ailments

while incarcerated at the Allred Unit.  Indeed, plaintiff may well be at greater risk of developing

serious health problems due to uncontrolled diabetes and hypertension, which risks possibly could

have been avoided or at least minimized had the medical staff acted sooner and pursued different

treatment options.  However, even if prison doctors and nurses exercised poor medical judgment

and, as Dr. Asbury contends, opted for "an easier, but ultimately less effective course of treatment,"

(*see id.* at 14, ¶ 9), such conduct does not amount to deliberate indifference.[4]  The decision whether

to provide additional or different treatment, such as alternate drug therapies, diagnostic testing, and

---

[4] Several federal courts, including one district court in the Fifth Circuit, have held that the denial of insulin to an insulin-dependent diabetic constitutes deliberate indifference. *See, e.g. Scinto v. Preston*, 170 Fed.Appx. 834, 835-36, 2006 WL 637190 at *2 (4th Cir. Mar. 14, 2006); *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005); *Johnson v. Ford*, Civ. A. No. C-05-223, 2006 WL 1006520 at *7 (S.D. Tex. Apr. 14, 2006).  In this case, however, the medical records conclusively establish that plaintiff was placed on oral insulin therapy three or four months after he was diagnosed with Type II diabetes.

like measures, "is a classic example of a matter for medical judgment." *Domino*, 239 F.3d at 756, *quoting Estelle*, 97 S.Ct. at 293.  That plaintiff and his expert may disagree with the course of treatment selected by prison doctors and nurses does not give rise to a constitutional violation. *See Norton*, 122 F.3d at 292.  At most, plaintiff has stated a claim for medical negligence, which is not actionable under 42 U.S.C. § 1983. *See Stewart*, 174 F.3d at 534.

There is absolutely no evidence that any of the defendants refused to treat plaintiff, consistently ignored his complaints, or engaged in any conduct "that would clearly evince a wanton disregard for any serious medical needs." *Johnson*, 759 F.2d at 1238.  Absent such evidence, plaintiff cannot establish deliberate indifference.

### D.

Plaintiff further alleges that he received inadequate medical care for an injury to his right great toe.  When plaintiff developed an infection after his toe nail was surgically removed in May 2004, he was provided with only a few bandages to cover the wound and told by a nurse to clean his toe in the toilet.  (Plf. MSJ App. at 200, ¶ 12).  The infection worsened when plaintiff did not receive follow-up medical care and went four days without antibiotics.  (*Id.* at 15, ¶ 12).  Plaintiff repeatedly sought treatment for the infection, but was forced to wait more than two weeks before seeing a doctor.  (*Id.* at 200, ¶ 12).  These allegations, if proved, arguably demonstrate deliberate indifference on the part of the prison medical staff.  However, plaintiff has failed to exhaust his administrative remedies with respect to this claim.

### 1.

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002); *see also Alexander v. Tippah County, Mississippi*, 351 F.3d 626, 630 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 2071 (2004); *Wendell v. Asher*, 162 F.3d 887, 890 (5th Cir. 1998).  The Supreme Court recently clarified that a prisoner must  complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  *Woodford v. Ngo*, 126 S.Ct. 2378, 2382 (2006).

The Texas prison system has developed a two-step grievance process.  A Step 1 grievance, which is handled at the prison level, must be filed within 15 days after the incident occurs.  If the prisoner receives an adverse decision at Step 1, he has 10 days to file a Step 2 grievance at the state level.  A prisoner must pursue his grievance at both the Step 1 and Step 2 levels in order to exhaust his administrative remedies.  *See Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004), *citing Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).

2.

Although plaintiff filed more than 35 Step 1 grievances, there is no evidence that he ever complained about inadequate medical care related to his infected toe.  Nor does plaintiff even attempt to argue that this claim is properly exhausted.  Rather, plaintiff maintains that defendants are procedurally barred from raising the exhaustion issue because it was not pled as an affirmative defense.  A similar argument was rejected by Fifth Circuit in *Johnson*.  Noting that some courts, including prior Fifth Circuit decisions, appear to suggest that exhaustion is a component of the plaintiff's claim, not an affirmative defense, the *Johnson* court wrote:

> While failure to raise an affirmative defense in the answer *generally* results in a waiver, noncompliance can be excused if the defendant raises the issue at a "pragmatically sufficient" time and there is no prejudice to the plaintiff.  The defendants raised the exhaustion issue in their motion for judgment on the pleadings, and here it does not appear that Johnson was surprised in any way, as might happen when a party waits until shortly before trial to raise a new defense.  Moreover, failure to plead exhaustion in the answer is especially excusable here given that the law on the topic is not clearly settled.

*Johnson*, 385 F.3d at 516 n.7 (citations omitted) (emphasis in original).  Like the defendants in

*Johnson*, the defendants in the instant case raised the exhaustion issue in their motion for summary

judgment.  Plaintiff fails to allege, much less prove, that he was prejudiced by the failure to plead

exhaustion as an affirmative defense.  Under these circumstances, plaintiff's unexhausted claim must

be dismissed with prejudice.  *See Underwood v. Wilson*, 151 F.3d 292, 296 (5th Cir. 1998), *cert.

denied*, 119 S.Ct. 1809 (1999) (dismissal with prejudice appropriate where inmate seeks "federal

court intervention in prison affairs prior to the prison having had the opportunity to address the

complaint within its grievance procedures").

IV.

In a separate claim, plaintiff alleges that one or more defendants retaliated against him by

withholding medical care, fabricating evidence used in a disciplinary action, and placing him in a

cell with a violent inmate.[5]

A.

Prison officials may not retaliate against an inmate for exercising his right of access to the

courts or using the grievance system.  *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995), *cert.

denied*, 116 S.Ct. 800 (1996); *Gibbs v. King*, 779 F.2d 1040, 1046 (5th Cir.), *cert. denied*, 106 S.Ct.

---

[5]  Plaintiff alludes to a number of other retaliatory actions in his complaint and throughout his affidavit. However, these are the only acts of retaliation discussed by plaintiff in his summary judgment response.  The court is neither required nor inclined to "sift through the record" in search of other instances of retaliation.  *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996) (citations omitted).

1975 (1986).   "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006), *quoting McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).  Mere conclusory allegations are insufficient.  *Woods*, 60 F.3d at 1166; *Richardson v. McDonnell*, 841 F.2d 120, 122-23 (5th Cir. 1988).  The prisoner must produce direct evidence of motivation or "allege a chronology of events from which retaliation may plausibly be inferred." *Woods*, 60 F.3d at 1166, *quoting Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988).

## B.

Plaintiff first contends that he was retaliated against for complaining about his medical care. In the spring of 2003, plaintiff told several doctors and nurses, including Dr. David Potter, that he was contemplating a lawsuit to enforce his civil rights.  (Plf. MSJ App. at 201, ¶ 15).  Dr. Potter allegedly responded by suggesting that plaintiff might get more out of his medical visits if he "stopped complaining about [his] medical treatment and threatening litigation."  (*Id.* at 201-02, ¶ 15).  Even if this remark was sufficient to establish an intent to retaliate on the part of the doctor, plaintiff was not subjected to an "adverse retaliatory act."   The Fifth Circuit has held that "[r]etaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Morris*, 449 F.3d at 686.  Although plaintiff construed Dr. Potter's comment as "a coercive threat designed to silence my complaints," (*see* Plf. MSJ App. at 202, ¶ 15), it obviously did not deter plaintiff from continuing to file grievances or prosecuting this lawsuit.

Plaintiff further alleges that Melissa Halvorsen, Barbara Enns, and Michael Martinez falsely accused him of being verbally abusive towards the medical staff after he filed grievances against

them. (*Id.* at 202, ¶ 16). As a result of this accusation, prison officials charged plaintiff with a disciplinary infraction and took away his recreation and commissary privileges for 30 days. (Def. MSJ App. at 338). While such punishment qualifies as an "adverse retaliatory act," *see Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003), plaintiff fails to allege, much less prove, "a chronology of events from which retaliation may be plausibly inferred." *Woods*, 60 F.3d at 1166. In particular, there is no evidence that plaintiff filed any grievances against his accusers at any time near the date of his disciplinary hearing. Without such evidence, plaintiff cannot prove causation.

Finally, plaintiff contends that he was assaulted by another inmate, Charles Gilmore, in retaliation for filing grievances about his medical care in the fall of 2004. In a signed statement included in the summary judgment record, Gilmore claims that he was placed in a cell with plaintiff "because the staff wanted me to hurt him physically." (Plf. MSJ App. at 332, ¶ 4).[6] Gilmore goes on to state that he was greeted by several nurses after the fight, including Nurse Walls, with expressions of gratitude. (*Id.* at 332, ¶ 5). Even if the court accepts this testimony, there is no evidence that any of the defendants were responsible for placing plaintiff and Gilmore in the same cell, much less orchestrated the attack for retaliatory reasons. That several nurses may have thanked Gilmore *after* the assault does not create a fact issue with respect to causation.

## CONCLUSION

Defendants' motion to dismiss or for summary judgment [Doc. #60] is granted. The court will dismiss with prejudice all claims brought by plaintiff against defendants by a separate judgment filed today.

SO ORDERED.

---

[6] Gilmore fails to explain how he knows why he was housed with plaintiff. To the extent Gilmore relies on statements made by unidentified prison staff members, his testimony constitutes inadmissable hearsay. *See Miller v. Solem*, 728 F.2d 1020, 1026 (8th Cir.), *cert. denied*, 105 S.Ct. 145 (1984) (inmate's affidavit containing hearsay statements made by prison warden held insufficient to defeat summary judgment).

DATED:  July 14, 2006.


JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE